970 So.2d 806 (2007)
David Sylvester FRANCES, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-892.
Supreme Court of Florida.
October 11, 2007.
Rehearing Denied December 6, 2007.
*809 James S. Purdy, Public Defender, and James R. Wulchak, Chief, Appellate Division, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm both the conviction and sentence.

Facts and Procedural History
David Sylvester Frances and his younger brother Elvis Frances were charged by indictment with the first-degree murders of Helena Mills and JoAnna Charles, the robbery of Mills' automobile, and two counts of the petit theft of Charles' jewelry and a Playstation video game system belonging to Mills' son.
Gleneth Byron, the mother of the Frances brothers, was a close friend of Mills and lived about five minutes from Mills' condominium in Orlando. The two families often socialized together. The Frances brothers had been living with Byron for about a month and neither was employed. Byron asked the brothers to move out and planned to give them money for bus tickets to Tallahassee, where the family had lived previously. David Frances *810 called Byron around noon on November 6, 2000, to tell her that the brothers had a ride to Tallahassee. When Byron returned home at 5 p.m., her sons and all of their belongings were gone.
Early that same morning, the Frances brothers rang the doorbell at Mills' condominium. Mills' thirteen-year-old son Dwayne Rivers answered the door and talked to the brothers briefly for a minute or two. Rivers knew the brothers from when they all had lived in the Virgin Islands. Rivers told the brothers that JoAnna Charles, who was a sixteen-year-old family friend living with Mills, was staying home from school that day because she was sick. The brothers departed and Rivers left for school at 8:45 a.m. When Rivers returned home at 6 p.m., he saw Charles' red Toyota in front of the condominium, but he did not see his mother's green Mazda 626 in the garage. Rivers called for Charles and banged on the locked door of the master bedroom, but did not receive a response. When Rivers entered the master bedroom through a sliding glass door on the balcony, he discovered the bodies of his mother and Charles on the floor of the bathroom. Rivers phoned Byron and then called 911.
When the paramedics arrived, they discovered Charles' body on top of Mills' body. Both women had been strangled with an electric cord. A cord was still wrapped around Charles' neck. The bodies were in rigor mortis. There were no signs of forced entry into the condominium. The medical examiner testified that Mills had multiple recent abrasions to her face, injuries to her neck, ruptured blood vessels in her face, and a cut across her neck caused by the cord being wrapped around her neck and pulled at each end. Charles had a groove around her neck with superficial lacerations. She also had crescent-shaped fingernail marks on her right neck caused by her attempts to remove either the ligature or hands from her neck. The material under Charles' nails matched her own DNA. Material removed from Mills' nails was identified as male DNA. While neither David nor Elvis could be excluded as the contributor of the material found under Mills' nails, the sample was so limited that this finding was not significant. The electrical cord around Charles' neck was tested for latent fingerprints, but there were not enough ridgelines on the latent prints to enable a match. No DNA testing was conducted on the electrical cord because the chemicals used for the latent print testing would have destroyed the DNA. Conversely, had the cord been tested for DNA, it would have obliterated any latent prints.
The tag number and information about Mills' stolen vehicle were entered into the national law enforcement data base. On December 5, 2000, the Frances brothers and three other individuals were stopped in Mills' vehicle in DeKalb County, Georgia. Elvis was driving the vehicle and David was a passenger in the back seat. The vehicle still bore Mills' license plate. David claimed that he had bought the vehicle in Tallahassee, but was unable to name the seller.
Orlando police detectives traveled to Georgia to interview the brothers. Twenty-year-old David gave a statement after being advised of his Miranda[1] rights and waiving them. In this statement, David originally denied any knowledge of the murders, claimed that he and Elvis took a bus from Orlando to Tallahassee, and stated that he had bought Mills' car from someone named "Will" in Tallahassee. David subsequently admitted being at Mills' house on the morning of the murders *811 and stated that Elvis killed both victims. David admitted that he helped Elvis move the bodies and participated in stealing Mills' car. David also admitted that the brothers took Mills' car and drove it to Tallahassee.
The officers then interviewed sixteen-year-old Elvis at the juvenile detention facility where he was being held. The officers played David's taped interview for Elvis. Elvis related a different version of events, claiming that David also participated in the murders. The brothers were arrested for first-degree murder and transported back to Florida. An attempt to record their conversations in the transport van was unsuccessful because the equipment did not work.
David was interviewed a second time on December 6. During this interview, David related the following additional details about the murders. Byron wanted the brothers out of her house, but they had no money and no place to go. After talking to Rivers on Monday morning, the brothers decided to steal Mills' car. They went back to Mills' house where they met her in her garden. Mills told the brothers to go inside. When she came in, both brothers jumped her. David strangled Mills with his hands until she passed out. Elvis attempted to do the same to Charles, but had difficulty because Charles struggled with him. Both brothers moved the women into the bedroom and David then strangled Mills with an electric cord. Because Charles "still had life in her," the brothers wrapped the electric cord around her neck and each pulled on an end in order to kill her. They took jewelry and a Playstation from the house and drove off in Mills' car. They pawned the stolen items for $240. They drove to Tallahassee and then to Georgia in Mills' car. Both of David's taped interviews were published to the jury at trial.
Mills' vehicle was sealed and returned to Orlando in a sealed car trailer. David's prints were lifted from the rear passenger window of the vehicle. The owner of the pawn shop identified receipts showing that the items from Mills' house were pawned at 11:32 a.m. on the morning of the murders. David presented his driver's license to pawn a PlayStation, a pendant, and three chains. Rivers was able to identify the pawned items as belonging to his mother and Charles. The thumbprint on the pawn ticket belonged to David Frances. Rivers was also able to recognize his mother's car keys based on a small blue flashlight with her employer's logo that was on the key ring.
David filed a pretrial motion challenging the legality of Florida's death penalty under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), based on the facts that the judge rather than the jury imposes sentence, jury unanimity is not required as to the sentence recommendation, and the role of the jury is allegedly minimized by the standard jury instructions. David also moved to bar victim impact evidence from the penalty phase, arguing that such evidence is irrelevant to any statutory aggravating circumstance and thus is unconstitutional. The trial court denied both motions.
The jury trial commenced on October 25, 2004, in the circuit court in Orange County. At the close of the State's case, David moved for a judgment of acquittal, arguing that premeditation had not been shown. The trial court denied the motion. The jury returned guilty verdicts on all of the charges.
At the penalty phase, the State presented victim impact testimony from Mills' son and Charles' mother and additional testimony from the medical examiner about the physical effects of asphyxiation. The defense presented the testimony of nine witnesses: *812 a psychotherapist and mitigation specialist who met and interviewed David and a number of people who knew him during his childhood; family members, friends, and former teachers and coaches; David's corrections officer; and Dr. Eric Mings, the psychologist who evaluated David's mental health status. All of the family members and friends testified that David was a quiet, respectful child and young man, but Elvis was aggressive and violent. They also testified that David tried to keep Elvis out of fights and trouble. Prison inmate Tameka Jones[2] testified about the murder of Monique Washington in Tallahassee in September 2000. Jones, who had been a roommate of the brothers in Tallahassee, went with Elvis to Washington's apartment, ostensibly to help Washington move her belongings. Instead, Elvis strangled Washington with his hands and an electric cord in order to steal her car. Jones also stated that David helped Elvis dispose of Washington's body after the fact. Dr. Mings testified that David has average intelligence and had developed a pathologically dependent relationship with Elvis at an early age.
The jury recommended that David be sentenced to death for Mills' murder by a vote of nine to three and for Charles' murder by a vote of ten to two. Additional live and videotaped mitigating evidence was presented to the court during the Spencer[3] hearing. The court found two aggravating circumstances applicable to Mills' murder: a prior violent felony based on the contemporaneous conviction for the murder of the other victim and that the murder was committed during the course of a robbery. The court found these same two aggravators applicable to Charles' murder, plus the heinous, atrocious, or cruel aggravating circumstance. The court rejected the statutory mitigators of no significant history of prior criminal activity (based on David's helping Elvis dispose of Washington's body and the fact that David was absent without leave (AWOL) from the United States Army) and acting under duress or the substantial domination of another, i.e., his brother Elvis. The court found and gave unspecified weight to David's "relative youth [twenty years old] together with other factors," but did not specify these other factors; the relative personalities of the two brothers (David being quiet and gentle; Elvis being aggressive and bad); and David's pathologically dependent relationship with Elvis. The court also gave "serious weight" to David being abandoned by his mother shortly after birth and being raised by his grandmother in poverty in the Virgin Islands; David's lack of a positive male role model; David's pathological relationship with Elvis, and Elvis's dominant role in the brothers' relationship. The court ruled that the aggravating circumstances outweighed the mitigating and imposed death sentences for both murders. The court also sentenced David to a consecutive fifteen-year sentence on the robbery conviction and sixty days on the petit thefts.
In his appeal to this Court, Frances raises three issues, each of which encompasses a number of sub-issues. He claims that: (1) the trial court improperly restricted his presentation of guilt and penalty phase evidence that was relevant to his relative culpability for the crimes and what sentence he should receive; (2) the trial court improperly found the heinous, atrocious, or cruel aggravating circumstance (HAC), excluded existing mitigating evidence, and concluded that the aggravating *813 circumstances outweighed the mitigating circumstances; and (3) Florida's death penalty statute is unconstitutional under Ring v. Arizona. We address each claim in turn below.

Exclusion of Evidence
Frances claims that the trial court erred in preventing him from presenting relevant evidence during both the guilt and penalty phases of his trial. Frances claims that the excluded evidence was relevant to the question of his relative culpability and other mitigating factors. He raises this claim as to eight different instances in which the trial court upheld the State's objections to testimony defense counsel sought to elicit. These included multiple hearsay objections to the testimony relating to the poor conditions of David's childhood home, conversations between the mitigation specialist and individuals about the brothers' childhood and background, David's and Elvis's reports of domestic abuse on David as a child, and David's statements to the mental health expert about his dependent relationship with Elvis. The trial court also sustained the State's objections to other defense testimony as being irrelevant or improper, including reports of prior violent acts by Elvis, testimony about why the Frances brothers had to leave their apartment in Tallahassee, the mental health expert's testimony about whether David exhibited "street smarts," and the mental health expert's opinion as to whether in-court testimony by other background witnesses was inconsistent with the expert's opinion about the brothers' relationship.
The State asserts that this issue has not been adequately briefed by Frances so as to present a viable claim. While Frances' exposition of these evidentiary claims is not a model of appellate clarity, we can discern the basis of his claims and the specific relevance that he attributes to the excluded evidence. Thus, we address these claims on the merits.
The only guilt phase claim involves evidence about why the Frances brothers had to leave their Tallahassee apartment. Frances argues that this evidence was relevant to his guilt because it showed why he "tried to minimize his brother's role in these killings" in his confession to the police. The remaining claims involve penalty phase proceedings; Frances alleges that evidence that was "highly relevant to the jury's consideration" of the appropriate sentence was excluded. We find no error on these evidentiary rulings.
A trial court's rulings as to the excluded evidence should be reviewed under the abuse of discretion standard. See, e.g., LaMarca v. State, 785 So.2d 1209, 1212 (Fla.2001) (explaining that a trial judge's rulings on the admission or exclusion of evidence are reviewed under the abuse of discretion standard). Under the abuse of discretion standard, "[d]iscretion is abused only `when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court.'" Trease v. State, 768 So.2d 1050, 1053 n. 2 (Fla.2000) (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)).
Our review of the record in this case shows that the trial court did not abuse its discretion in excluding the evidence in question. In several instances the evidence was actually presented through the testimony or videotaped depositions of the individuals who had firsthand knowledge of the information, rather than through the testimony of the mitigation specialist who was asked to relate her conversations with these individuals. In several other instances, the defense attempted to introduce hearsay statements *814 made by the Frances brothers, neither of whom testified at trial and thus were not subject to the State's cross-examination. Section 921.141(1), Florida Statutes (2006), provides in pertinent part: "Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements." While the statute "relaxes the evidentiary rules during the penalty phase of a capital trial, the statute clearly states that the defendant must have an opportunity to fairly rebut the hearsay evidence in order for it to be admissible. This rule applies to the State as well." Blackwood v. State, 777 So.2d 399, 411-12 (Fla.2000) (citation omitted); see also Hitchcock v. State, 578 So.2d 685, 690 (Fla.1990) (finding no merit to claim that state's ability to introduce hearsay in a penalty proceeding is limited while a defendant's ability to introduce hearsay is unlimited). Additionally, the defense was able to elicit some of the information through opinion testimony of the mental health expert. Thus, the trial court did not abuse its discretion when it excluded these hearsay statements by the brothers.
We also conclude that Frances did not properly preserve the claim relating to Elvis's unrelated act of violence because he never proffered the contents of the excluded evidence to the trial court. See Blackwood, 777 So.2d at 410-11; Lucas v. State, 568 So.2d 18, 22 (Fla.1990) ("A proffer is necessary to preserve a claim such as this because an appellate court will not otherwise speculate about the admissibility of such evidence."); Jacobs v. Wainwright, 450 So.2d 200, 201 (Fla.1984) ("The purpose of a proffer is to put into the record testimony which is excluded from the jury so that an appellate court can consider the admissibility of the excluded testimony. Reversible error cannot be predicated on conjecture."). The failure to do so, therefore, prevents appellate review of the excluded items. See Blackwood, 777 So.2d at 411; see also Finney v. State, 660 So.2d 674, 684 (Fla.1995) ("Without a proffer it is impossible for the appellate court to determine whether the trial court's ruling was erroneous and if erroneous what effect the error may have had on the result.").
Finally, we find no error in the exclusion of certain testimony by the mental health expert, including whether David possessed "street smarts" and comments on the credibility of testimony by lay witnesses who knew the Frances brothers during their childhood. A trial court has broad discretion in determining the range of subjects on which an expert witness can testify, and, absent a clear showing of error, the court's ruling on such matters will be upheld. See Pagan v. State, 830 So.2d 792, 815 (Fla.2002); Finney, 660 So.2d at 682. Expert testimony should be excluded when the facts testified to are of such nature as not to require any special knowledge or experience in order for the jury to form its conclusions. See Simmons v. State, 934 So.2d 1100, 1117 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1334, 167 L.Ed.2d 80 (2007); Johnson v. State, 438 So.2d 774, 777 (Fla.1983) (holding that jury was fully capable of assessing a witness's ability to perceive and remember, given the assistance of cross-examination and cautionary instructions, without the aid of expert testimony and finding no abuse of discretion in the trial court's refusal to allow professor of psychology to testify as expert witness in the field of eyewitness identification). Additionally, it is not proper to allow an expert to vouch for the truthfulness or credibility of a witness. See Feller v. State, 637 So.2d 911, 915 (Fla.1994); State v. Townsend, 635 So.2d 949, 958 (Fla.1994). Thus, the trial court *815 did not abuse its discretion in excluding this testimony.

Aggravating and Mitigating Circumstances
Frances claims that his death sentences are improper based on four alleged errors relating to the aggravating and mitigating circumstances. He claims that the heinous, atrocious, or cruel (HAC) aggravating factor does not apply in his case; that the trial court gave improper weight to the prior violent felony conviction aggravating circumstance and to the mitigating circumstances; and that the death sentence is disproportionate.
The trial court found the HAC aggravating factor applicable to the murder of Joanna Charles, but not to the murder of Helena Mills. Frances argues that the trial court improperly found HAC because the evidence "made it no more likely than not that Charles lost consciousness upon her initial manual strangulation at Elvis' hands." Frances contends that the trial court speculated that Charles was conscious when he joined Elvis in strangling her and there is nothing in the evidence to support the court's supposition. Without such proof, Frances maintains, the HAC aggravator cannot be established.
When evaluating claims alleging error in the application of aggravators, this Court does not reweigh evidence to determine whether the State proved each aggravating factor beyond a reasonable doubt. See Alston v. State, 723 So.2d 148, 160 (Fla.1998). Rather, the Court's function is "to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding." Id. (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)).
Here, the trial court cited the HAC definition set forth by this Court in State v. Dixon, 283 So.2d 1, 9 (Fla.1973), and which is still cited as the standard definition for HAC. See Hutchinson v. State, 882 So.2d 943, 962 (Fla.2004) (Pariente, J., concurring). As this Court explained in Barnhill v. State, 834 So.2d 836 (Fla.2002),
HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death. Thus, if a victim is killed in a torturous manner, a defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim's death is evidence of a defendant's indifference. Because strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC.
Id. at 849-50 (citations omitted).
In fact, this Court has repeatedly held that HAC applies to murders by strangulation of a conscious victim because a killing by this method is inherently torturous. See Mansfield v. State, 758 So.2d 636, 645 (Fla.2000); Orme v. State, 677 So.2d 258, 263 (Fla.1996); Tompkins v. State, 502 So.2d 415, 421 (Fla.1986) ("[I]t is permissible to infer that strangulation, when perpetrated upon a conscious victim, involves foreknowledge of death, extreme anxiety and fear, and that this method of killing is one to which the factor of heinousness is applicable.").
In the sentencing order in this case, the trial court noted that the testimony of the medical examiner, Frances' confession, and the circumstances of the murder all supported the HAC aggravator. The medical *816 examiner testified that both victims died of strangulation and would have been conscious and aware of what was happening for a minimum of one to two minutes and would have felt the pain associated with hands and a ligature around their necks. Both victims had cuts on their necks that were consistent with an electrical cord being pulled tight around the neck, and the cord was actually recovered from Charles' neck. Crescent-shaped fingernail marks or gouges were also found on Charles' neck and her own DNA was found under her fingernails, indicating defensive attempts by Charles to prevent the strangulation. The medical examiner explained that an unconscious person does not fight or struggle. The medical examiner opined that Charles' death was not instantaneous and not without her knowledge.
David's taped confession confirmed the medical examiner's testimony. He stated that Charles was still conscious and struggling when he helped Elvis strangle her with the electric cord. David described Charles as still having life in her when he and Elvis moved her to the bathroom floor. Therefore, they wrapped the cord around her neck a second time and strangled her again.
The sentencing order also noted that the other circumstances of the murder would have added to Charles' anxiety and terror. She was attacked in her own home by two people she knew; she was clearly conscious during her initial struggle with Elvis and aware of her impending death; when David arrived, she soon realized that he was not there to help her but was aiding Elvis in killing her; and she struggled against the two attackers, who overpowered her. The trial court concluded that Charles suffered mental and physical torture inflicted by David Frances.
We conclude that Frances' confession and the medical examiner's testimony provide competent, substantial evidence to support the trial court's finding that Charles was conscious and struggled against her attackers as she was strangled. Thus, we affirm the trial court's finding that the HAC aggravating circumstance applied to Charles' murder.
Frances argues that the trial court should have given less weight to the prior violent felony aggravating circumstance because it was based on his contemporaneous convictions for the murders of the two victims and because he had lived a violence-free life up to the time of these crimes. The weight to be accorded an aggravator is within the discretion of the trial court and will be affirmed if based on competent, substantial evidence. See Sexton v. State, 775 So.2d 923, 934 (Fla.2000); Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990).
"[T]he contemporaneous conviction of a violent felony may qualify as an aggravating circumstance, so long as the two crimes involved multiple victims or separate episodes." Pardo v. State, 563 So.2d 77, 80 (Fla.1990); see also Winkles v. State, 894 So.2d 842, 846 (Fla.2005) (finding that each murder in the indictment to which defendant pled guilty constituted a prior violent felony conviction as to the other murder conviction); Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (noting that one of the aggravating factors found was prior violent felony based on the contemporaneous murders of the two victims); Francis v. State, 808 So.2d 110, 136 (Fla. 2001) (finding that trial court correctly found that murder conviction as to one victim aggravated the murder conviction as to other victim, and vice versa).
In the instant case, the jury found David Frances guilty of two counts of premeditated murder for killing the two victims. Thus, the prior violent felony aggravating *817 circumstance clearly applies and the only real issue is the weight accorded to this aggravator, which we review under the abuse of discretion standard. A court abuses its discretion "only `when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court.'" Trease v. State, 768 So.2d 1050, 1053 n. 2 (Fla.2000) (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)).
Frances cites Terry v. State, 668 So.2d 954, 965 (Fla.1996), and Almeida v. State, 748 So.2d 922, 933 (Fla.1999), in which this Court found that the prior violent felony aggravating factor should be accorded less weight based on the circumstances surrounding the prior convictions. However, the circumstances and facts of those cases are distinguishable from this case.
In Terry, the prior violent felony did not represent an actual violent felony previously committed by the defendant. 668 So.2d at 965. Rather, the aggravator was based on the defendant's contemporaneous conviction as a principal to an aggravated assault simultaneously committed by a codefendant who pointed an inoperable gun at the victim's husband. Id. While we recognized that this contemporaneous conviction qualified as a prior violent felony and a separate aggravator, we concluded that we could not ignore the circumstances, namely that the felony occurred at the same time as the murder, was committed by a codefendant, and involved the threat of violence with an inoperable gun. Id. at 966. However, our final observation on this point in Terry belies Frances' argument here. We explained that the situation in Terry "contrasts with the facts of many other cases where the defendant himself actually committed a prior violent felony such as homicide." Id. These are the exact circumstances in Frances' case.
In Almeida, the sole aggravating circumstance was a prior violent felony conviction, based on the defendant's prior murders of two prostitutes. 748 So.2d at 933. Additionally, the trial court found three statutory mitigators (extreme emotional disturbance, impaired capacity, and age of twenty at the time of the crime) and extensive nonstatutory mitigation, including a brutal childhood and vast mental health mitigation. In light of this substantial mitigation and the single aggravator, we found Almeida's death sentence disproportionate. Id.
While Frances was also twenty years old at the time of these two murders, he had little or no mental health mitigation, with the exception of his "pathologically dependent relationship" with Elvis. Additionally, Frances' case involved two other aggravating circumstances, that Charles' murder was HAC and both murders were committed during a robbery. Almeida did not commit his murders to get property from the victims; he apparently acted impulsively in a drunken rage. Almeida, 748 So.2d at 932-33.
In other cases, we have described the prior violent felony aggravating circumstance as "especially weighty." Ferrell v. State, 680 So.2d 390, 391 (Fla.1996) (affirming death sentence where single aggravating circumstance of prior violent felony was "weighty"); Duncan v. State, 619 So.2d 279, 284 (Fla.1993) (affirming death sentence where sole aggravating factor was prior second-degree murder). Thus, we find no abuse of discretion in the weight accorded this aggravating factor in this case, where the defendant strangled two women to death in order to steal a car and other items that he pawned for cash.
Frances also argues that the mitigating circumstances found by the trial court, *818 along with other mitigators presented but not found, outweigh the aggravating circumstances. Frances contends that the trial court should have found the statutory mitigators of extreme duress or substantial domination and no significant history of prior criminal activity. He also contends that the trial court's consideration of the statutory mitigator of age was improper.
The trial court noted that Frances had offered evidence that he was under the influence of his younger brother Elvis, but the court did not find the evidence persuasive. The court found that because Frances "maintained a normal capacity of independent choice and freedom of action, such influence did not rise to the level of extreme duress or substantial domination." The court also rejected the mitigator of no significant history of prior criminal activity because Frances' "history of helping Elvis dispose of Monique Washington's body while AWOL from the U.S. Army is significant and precludes this as a mitigating circumstance."
The trial court did find a number of nonstatutory mitigating factors relating to Frances' history, personality and conduct.[4] The court "weighed them carefully and [gave] serious weight to them." Ultimately, however, the court found that the aggravating circumstances "greatly outweigh" the mitigating circumstances.
The only statutory mitigating factor that the trial court found present was Frances' age of twenty years at the time of the crime. Frances argues that the trial court did not properly detail its weighing process as to the age mitigating factor. The sentencing order does not state how much weight the court gave this factor. It simply states that the court "weighed [Frances'] relative youth together with other factors," presumably the nonstatutory mitigating factors that the court found present and to which it gave serious weight. The trial court's statement that it weighed and considered the age factor substantially comports with the requirements of Campbell v. State, 571 So.2d 415, 420 (Fla.1990).
Frances also contends that the trial court improperly rejected the statutory mitigating circumstances that the defendant acted under extreme duress or under the substantial domination of another individual and that the defendant has no significant history of prior criminal activity. The State contends that the statutory mitigating circumstances were waived by Frances and cites to a portion of the charge conference as evidence of this waiver. However, when the excerpt is read in context, it is clear that Frances did not waive the statutory mitigators but only the standard jury instructions on these mitigators. Instead of giving the jury individual instructions on each of the statutory mitigators and a general instruction on any other aspect of the defendant's background or the circumstances of the crime, Frances requested that the jury only receive the general instruction. Frances filed a motion in limine to preclude reference to nonenumerated mitigators as "nonstatutory" mitigating factors, *819 arguing that the delineation between statutory and nonstatutory mitigating factors tended to denigrate nonstatutory mitigators as inferior. The transcript of the charge conference clearly indicates that Frances wanted a general instruction that the jury could consider any aspect of his character, background, or record that it found to be mitigating, in lieu of specific instructions listing the enumerated statutory mitigators and a general instruction on nonstatutory mitigators. Thus, we conclude that Frances did not waive the statutory mitigators and these claims are properly before this Court.
Ordinarily, it is within the trial court's discretion to decide whether a mitigating circumstance is proven. Pardo v. State, 563 So.2d 77, 80 (Fla.1990); Scull v. State, 533 So.2d 1137, 1143 (Fla.1988); Teffeteller v. State, 439 So.2d 840, 846 (Fla. 1983). Further, the relative weight given each mitigating factor is within the province of the sentencing court and will be sustained on appellate review if supported by sufficient, competent evidence in the record. Campbell, 571 So.2d at 420.
Frances argues that the trial court erred in rejecting the duress/domination mitigating factor in light of the "uncontroverted evidence" that Elvis was the leader and that David "acted under duress and the substantial domination of Elvis." The witnesses testified that Elvis had a quick temper, was aggressive, and got into fights often. In contrast, the witnesses described David as having a very calm temperament and noted that he often stepped in to break up Elvis's fights. However, the witnesses did not testify that Elvis was the leader in the brothers' relationship, that he dominated David, or that he forced David to participate in any of the criminal activities. Psychologist Dr. Mings testified that David has a pathologically dependent relationship with Elvis, that David sees Elvis as all he has emotionally, and the only thing unusual about David is the extent to which he is bonded to Elvis. Dr. Mings also testified that David went AWOL from the Army in part because he wanted to return to Elvis because Elvis was continuing to get into trouble. Moreover, even though David was not present when Elvis killed Monique Washington in Tallahassee, David agreed to help Elvis dispose of Washington's body, stole several items from Washington's apartment after the murder, pawned some of them, and drove with Jones to Atlanta in Washington's car. This does not describe an individual who is acting under the domination of another.
Further, there was no evidence or testimony that Elvis was the primary motivator of the criminal episode that led to the murder of Mills and Charles. In fact, David admitted being actively involved in the murders: he jumped Mills when the brothers entered the apartment; he manually strangled Mills into unconsciousness; and he helped Elvis subdue and strangle Charles. David's thumbprint and name appeared on the pawn ticket for the items stolen from Mills' condominium. David was present in the vehicle stolen from Mills and initially claimed that he had bought the vehicle. David also initially placed all of the blame for the murders on Elvis. Only after the police spoke to Elvis and told David that their stories did not match did David admit his active participation in the murders. While David's actions in these crimes are not consistent with his general personality traits and the behavior described by the witnesses, none of the evidence supports Frances' claim that Elvis dominated him or that he acted under duress from Elvis. Thus, there is sufficient, competent evidence to support the trial court's rejection of this mitigator.
*820 Frances also argues that the trial court erred in rejecting the statutory mitigator of no significant history of prior criminal activity. The trial court did not find this mitigator present because David helped Elvis dispose of Washington's body and David was AWOL from the Army. The sentencing order finds these activities to be "significant" criminal activity that precludes this mitigating circumstance.
In Teffeteller, the trial court rejected the "no significant history of prior criminal activity" mitigating circumstance in light of the defendant's previous forgery conviction and a prison escape. The defendant argued that this history did not rise to the level of "significant" prior criminal activity. In rejecting this claim, this Court stated that it could not "say that it was error for the trial court to find a forgery conviction and a prison escape to be a significant history of criminal activity." 439 So.2d at 847.
The same can be said in the instant case. The record shows that David Frances was AWOL from the Army and was being sought by military authorities. He was also charged as an accessory after the fact in the murder of Monique Washington. He helped Elvis dispose of Washington's body, did not report the crime to authorities, and took items of value from her house and pawned them. Thus, we conclude that the trial court did not abuse its discretion in determining that this constituted a significant history of prior criminal activity.
Finally, Frances contends that the death sentence is disproportionate in his case. In deciding whether a death sentence is proportionate, this Court must consider the totality of the circumstances and compare the case with other capital cases. See Sexton v. State, 775 So.2d 923, 935 (Fla.2000). This analysis "is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990). Instead, this Court must look to the nature of and the weight given to the aggravating and mitigating circumstances. For purposes of proportionality review, this Court accepts the jury's recommendation and the trial judge's weighing of the aggravating and mitigating evidence. Bates v. State, 750 So.2d 6, 12 (Fla.1999).
Here, the jury recommended the death sentence for both murders, by a vote of nine to three in Mills' murder and of ten to two in Charles' murder. The trial court found two statutory aggravators for the murder of Mills: (1) the defendant was previously convicted of another capital felony (the contemporaneous conviction for the murder of the other victim) and (2) the murder was committed during the course of a robbery. The trial court also found the third aggravator of HAC applicable to Charles' murder. The court found the statutory mitigating factor of age and a number of nonstatutory mitigators relating to Frances' history, personality, and conduct and gave "serious weight" to them. The circumstances of the crime are the murder of two victims by manual and ligature strangulation in order to take a car and other items of value from them. This was not a "robbery gone bad." Frances and his brother went to the victims' house to take the car and immediately "jumped" the victims and began strangling them. Moreover, rather than leave the victims unconscious from the strangling, Frances and his brother strangled them again to make sure they were dead.
Frances cites a number of cases in his proportionality argument. See Hawk v. State, 718 So.2d 159 (Fla.1998); Kramer v. State, 619 So.2d 274 (Fla.1993), DeAngelo v. State, 616 So.2d 440 (Fla.1993); Livingston v. State, 565 So.2d 1288 (Fla.1988); Fitzpatrick v. State, 527 So.2d 809 (Fla. *821 1988). However, in several of these cases the murders occurred during a heated or ongoing dispute between the victim and the defendant. See Kramer, 619 So.2d at 278 (describing murder as "nothing more than a spontaneous fight, occurring for no discernible reason, between a disturbed alcoholic and a man who was legally drunk"); DeAngelo, 616 So.2d at 443 (noting "substantial evidence of an ongoing quarrel" between the defendant and the victim, who lived with defendant and his wife). Further, the defendants in all of the cases cited by Frances had mental health problems and some had substance abuse problems. See Hawk, 718 So.2d at 163 (noting that two aggravating circumstances were "arrayed against copious mitigation," including statutory mitigator of impaired capacity, age of nineteen, brain damage from childhood meningitis, mental and emotional disturbance, loss of hearing, disadvantaged and abusive childhood, and lack of education and training); Kramer, 619 So.2d at 278 (noting presence of mitigating factors of alcoholism, mental stress, severe loss of emotional control and both statutory mental mitigators); DeAngelo, 616 So.2d at 443 (noting "significant mental mitigation," including bilateral brain damage, hallucinations, delusional paranoid beliefs, and mood disturbance); Livingston, 565 So.2d at 1292 (noting mitigating factors of severe childhood abuse and neglect, youth and immaturity based on age of seventeen, marginal intellectual functioning, and extensive use of cocaine and marijuana); Fitzpatrick, 527 So.2d at 812 (noting that one expert described defendant as being "crazy as a loon," that both statutory mental mitigators were present, and that defendant's emotional age was between nine and twelve years old). Thus, the cases that Frances cites for his proportionality argument are factually distinguishable from this case, in which there was no evidence of a dispute or quarrel between the Frances brothers and either of the victims and, aside from the evidence of Frances' "pathological dependence" on his brother Elvis, there was no evidence of mental mitigation.
In contrast, this Court has found death to be the appropriate penalty in other cases involving similar aggravating and mitigating circumstances. See, e.g., Conahan v. State, 844 So.2d 629 (Fla.2003) (finding death sentence proportionate where victim was strangled with a ligature and trial court found three aggravators of committed during course of kidnapping, cold, calculated, and premeditated (CCP), and HAC and four nonstatutory mitigating factors relating to defendant's relationships and character); Hauser v. State, 701 So.2d 329 (Fla.1997) (finding death sentence proportionate where the victim was strangled and the trial court found three aggravators of HAC, CCP, and pecuniary gain balanced against one statutory mitigator of no significant history of prior criminal activity and four nonstatutory mitigators, including being under the influence of drugs or alcohol at the time of the murder and a long history of mental health problems); Mann v. State, 603 So.2d 1141 (Fla.1992) (upholding death sentence for murder where the trial court found the aggravating circumstances of prior violent felony, murder during the commission of a felony, and HAC and several nonstatutory mitigating circumstances, including remorse).
The circumstances of these murders clearly demonstrate that the sentences of death in this case are proportionate to other murder cases involving multiple strangulation victims.

Ring Claims
Frances contends that Florida's capital sentencing statute is facially unconstitutional under Ring v. Arizona, 536 U.S. 584, *822 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because the judge rather than the jury makes the findings of fact necessary to impose the death sentence. Frances filed a pretrial motion challenging the legality of Florida's death penalty under Ring because the judge rather than the jury imposes sentence and jury unanimity is not required as to the sentence recommendation. He also claimed that Florida's standard jury instructions minimize the role of the jury.
However, in over fifty cases since Ring's release, this Court has rejected similar Ring claims. See Marshall v. Crosby, 911 So.2d 1129, 1134 n. 5 (Fla.2005), cert. denied, ___ U.S. ___, 126 S.Ct. 2059, 164 L.Ed.2d 807 (2006). As the Court's plurality opinion in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), noted, "the United States Supreme Court repeatedly has reviewed and upheld Florida's capital sentencing statute over the past quarter of a century." Id. at 695 & n. 4 (listing as examples Hildwin v. Florida, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), and Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)); see also King v. Moore, 831 So.2d 143 (Fla.2002) (denying relief under Ring).
Frances' claim is without merit. Ring did not alter the express exemption in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that prior convictions are exempt from the Sixth Amendment requirements announced in the cases. Id. at 490, 120 S.Ct. 2348.[5] This Court has repeatedly relied on the presence of the prior violent felony aggravating circumstance in denying Ring claims. See, e.g., Smith v. State, 866 So.2d 51, 68 (Fla.2004) (denying relief on Ring claim and "specifically not[ing] that one of the aggravating factors present in this matter is a prior violent felony conviction"); Davis v. State, 875 So.2d 359, 374 (Fla.2003) ("We have denied relief in direct appeals where there has been a prior violent felony aggravator."); Johnston v. State, 863 So.2d 271, 286 (Fla.2003) (stating that the existence of a "prior violent felony conviction alone satisfies constitutional mandates because the conviction was heard by a jury and determined beyond a reasonable doubt"); Henry v. State, 862 So.2d 679, 687 (Fla.2003) (stating in postconviction case that this Court has previously rejected Ring claims "in cases involving the aggravating factor of a previous violent felony conviction").
Additionally, this Court has rejected claims that Ring requires the aggravating circumstances to be individually found by a unanimous jury verdict. See Hodges v. State, 885 So.2d 338, 359 nn. 9-10 (Fla. 2004); Blackwelder v. State, 851 So.2d 650, 654 (Fla.2003); Porter v. Crosby, 840 So.2d 981, 986 (Fla.2003). The Court has also repeatedly rejected challenges to Florida's standard jury instructions based on Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). See Mansfield v. State, 911 So.2d 1160, 1180 (Fla. 2005); Sochor v. State, 619 So.2d 285, 291 (Fla.1993); Turner v. Dugger, 614 So.2d 1075, 1079 (Fla.1992).
In the instant case, the trial court found the aggravating circumstances of a prior violent felony conviction, based on Frances' contemporaneous convictions for *823 the murder of the two victims, and the murder was committed during a robbery. In the guilt phase, a unanimous jury found Frances guilty beyond a reasonable doubt of two counts of premeditated murder and one count of robbery, thereby satisfying the mandates of the United States and Florida Constitutions. See Kimbrough v. State, 886 So.2d 965, 984 (Fla.2004); Doorbal v. State, 837 So.2d 940, 963 (Fla.2003). Thus, Frances is not entitled to relief on this claim.

Conclusion
For the reasons stated above, we find no merit to Frances' claims relating to either the guilt or penalty phases of his trial. Accordingly, we affirm Frances' convictions of first-degree murder and his sentences of death.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Jones was serving a sentence for third-degree murder based on her role in the murder of Monique Washington.
[3] Spencer v. State, 615 So.2d 688 (Fla.1993).
[4] The sentencing order notes the following nonstatutory mitigating circumstances: Frances had a kind and gentle nature as a child and teen; he has a clear sense of right and wrong; he participated as a team player in sports; he exhibited good demeanor as a model inmate; he developed a pathologically dependent relationship with Elvis from an early age which resulted in him being pulled into Elvis's lifestyle; he is polite, quiet, and reserved; he was abandoned by his mother shortly after birth and was raised in poverty by his grandmother in a small home in the Virgin Islands; and he lacked a positive male role model.
[5] In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added).